## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.   1:17-CV-31 |
| | : | |
| ALLEGHENY COLLEGE, | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT

Plaintiff, John Doe,[1] by his lawyers, files this Complaint against Allegheny College and, in support hereof, states as follows:

## I.    NATURE OF THE ACTION

1.      This case arises from the actions taken by Defendant, Allegheny College ("Allegheny" or "College"), its agents or employees, and Jane Doe, a female student at Allegheny, following false allegations made by Jane Doe ("Jane") against Plaintiff, John Doe ("John"), a male student at Allegheny.

2.      These false allegations relate to what was consensual sexual activity between John and Jane on or about September 26, 2014 ("Incident").  Jane admittedly returned to John's dorm room on the following night and slept with him again but they did not engage in any sexual activity.

3.      On or about December 17, 2014, more than two months later, after seeing John attending a party with another girl, Jane contacted Allegheny's Title IX Coordinator, Katie Pope, ("Coordinator Pope") and reported that she was "raped" during the incident on September 26, 2014.

---

[1]      With this Complaint, John has filed a Motion for Permission to Proceed under Pseudonym.

4.      At about the same time that Jane made this report to Allegheny, Jane also told her friend that she was angry with John because he refused to talk to her anymore and now she didn't want him going to the same school as her so she was going to press charges and try to get him expelled from Allegheny.  Although John provided Allegheny with a statement from this witness, Allegheny's Title IX Investigator did not interview this witness and Coordinator Pope refused to allow the witness to testify before the Title IX Committee on March 24, 2015.  These facts and other facts set forth herein demonstrate that Jane's claim was false and that Allegheny undertook a flawed and gender-biased investigation and later convened a similarly flawed and gender-biased hearing that resulted in John's expulsion.

5.      Thereafter, on appeal, despite John both offering new facts not available to him at the time of the hearing and identifying various violations of the process committed by Allegheny, including Allegheny's refusal to interview material witnesses and its denying John the opportunity to present complete information to the committee, Allegheny's President summarily ratified the decision to expel John.

6.      After a flawed and gender-biased investigation and hearing, Allegheny made a finding of sexual misconduct against John, and after an appeal during which Allegheny's President ignored both violations of Allegheny's own policies that governed the investigation and hearing process, and new and significant facts not available at the hearing, Allegheny's President expelled John.

7.     When Allegheny subjected John to disciplinary action, it did so in an arbitrary and capricious manner, violated its own policies, procedures and guidelines[2], and discriminated against him based upon his male gender.  Allegheny's policy itself is insufficient to protect the rights of male students.  Further, Allegheny relied on a discriminatory bias in favor of females and against males in making its finding of sexual misconduct and in ratifying the biased process and flawed decision on appeal.

8.     Allegheny at all times acted through its agents, servants, employees and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Allegheny's business, mission and/or affairs.

9.     Allegheny's actions surrounding its flawed and gender-biased investigation, hearing and appeal process caused John to suffer damages, harms and losses, including damage to his academic future, financial loss incurred obtaining a college education, and harm to John and his family following sacrifices they made so that he could receive a quality education.

10.     John brings this action against Allegheny to obtain relief for the damages, harms and losses caused by Allegheny based upon *inter alia* violations of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, 34 C.F.R. § 106.8(a) (Dep't. of Education), 28 C.F.R. § 54.135(b) (Dep't. of Justice), Revised Sexual Harassment Guidance: Harassment of Students by School employees, Other Students, or Third Parties, breach of contract, promissory estoppel, negligence, and Pennsylvania's Unfair Trade Practices/Consumer Protection Law.

---

[2]     Allegheny's policy against Discriminatory Sexual Harassment, College Policy # 4, can be found at page 137 in The Compass ("Allegheny's policy") as Exhibit A which is hereby incorporated by reference.

## II.   PARTIES

11.     John Doe is a natural person, citizen of the United States, and resident of the State of New York.  During the events described herein, John was a student at Allegheny which is located in Meadville, Pennsylvania, and he resided on campus.

12.     It is believed and therefore averred that Allegheny is a private college with an address of 520 North Main Street, Meadville, Pennsylvania 16335.  It is also believed and therefore averred that Allegheny receives federal financial funding.

## III.   JURISDICTION AND VENUE

13.     This Court has federal question and supplemental jurisdiction under 28 U.S.C. § 1331 because John's claims arise under the United States Constitution and the laws of the United States including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-88.

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, Diversity of Citizenship, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

15.     This Court has supplemental jurisdiction over related state common law and statutory claims pursuant to 28 U.S.C. § 1367 under the principles of ancillary and/or pendant jurisdiction.

16.     This Court has personal jurisdiction over Allegheny because the College conducts business within the Commonwealth of Pennsylvania.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

## IV.   FACTUAL BACKGROUND

### A.   John Doe's decision to attend Allegheny College

18.     Before enrolling at Allegheny in August of 2014, John was a highly accomplished

high school student in New York, where he maintained a 91.14 average, scored well on the

Scholastic Assessment Test (Math 650, or 85th percentile of test-takers nationwide; Reading 590,

or 80th percentile; and Writing 590, or 80th percentile), and was a captain of both the varsity

cross-country and track teams.

19.     Armed with his academic record, exam scores, and athletic achievements, John

was capable of enrolling at colleges and universities with competitive and more selective

admission standards, similar to Allegheny.

20.     After being accepted at Allegheny, John spent the remainder of his senior year in

high school preparing for his undergraduate education, the first step in his goal to attend medical

school at a highly ranked college or university, after which he planned to become an emergency

room physician.

### B.   Allegheny's Policies & Procedures

21.     The Allegheny Student Handbook, commonly known as *The Compass*, sets forth

Allegheny's policies & procedures for the investigation and adjudication of alleged disciplinary

violations, including alleged violations of the College's sexual misconduct policy.

22.     The Allegheny Student Handbook broadly states:

> *Allegheny College prohibits discrimination on the basis of* race,
> color, national origin, ethnicity, sexual orientation, *gender*, gender
> identity, gender expression, age, religion, disability and other
> criteria protected by applicable law.  Allegheny also prohibits
> discriminatory and sexual harassment, sexual assault and other
> forms of sexual violence, dating violence, domestic violence and

-5-

stalking.  The College is dedicated to furthering the potential of each member of its community through education and advocates a diverse community that is not hampered by intimidation, hostility, violence or other types of injurious or offensive behavior.  As affirmed in the Statement of Community, members of the College community will respectfully confront and proactively seek to prevent all forms of discriminatory and sexual harassment and sexual violence in the Allegheny College community.

In establishing this policy, the College's purposes include: (1) to make clear that no member of our College community shall be subject to *any harassment*, abuse or violence based on the individual's race, color, national origin, ethnicity, sex, sexual orientation, *gender*, gender identity, gender expression, age, religion, or disability; (2) to provide a means by which the entire College community can be made aware of the deep-seated, corrosive and sometimes hidden nature of racism, sexism, religious bigotry and other forms of group hatred; and (3) to set forth the processes available for reporting, investigating and resolving alleged instances of discriminatory and sexual harassment, sexual assault and other forms of sexual violence, dating violence, domestic violence and stalking.  The College will respond promptly and appropriately to any form of alleged misconduct under this policy occurring in the College community.

Allegheny also affirms its commitment to the principles of free speech and inquiry.  The legitimate exercise of these freedoms in our community does not include either the right to engage in abusive behavior toward others or to curtail the freedom of others to participate in a shared learning experience.  *Promoting the diverse environment free of discrimination*, discriminatory harassment and sexual harassment while supporting freedom of speech is not to be viewed as mutually exclusive; these values are to be considered in tandem when addressing incidents of alleged discriminatory harassment or sexual harassment.

(*See*, Student Handbook, attached and incorporated as Exhibit A, pp 137-138)(emphasis added).

23.     Allegheny's policy provides that sexual misconduct allegations should be reported to the Title IX Coordinator or one of the Deputy Title IX Coordinators.  (*Id.* at p. 139).

24.     Allegheny's policy does *not* mandate fixed deadlines by which an investigation or adjudication must be scheduled or completed but states only that the "investigation shall be completed as promptly as possible and in most cases in less than sixty working days from the receipt of the original complaint." (*Id.* at p. 143)(emphasis added). Allegheny's policy also provides that, "some investigations may *not* be completed in this time frame due to the nature and extent of the allegations or other extenuating circumstances." (*Id.)*(emphasis added).

25.     Allegheny's policy states that the procedures for the formal complaint process are, in pertinent part, as follows:

> That the allegation of a violation of this policy has not been resolved as a result of the informal process or is not suited for informal efforts ... *the following process will be initiated* (The lodging and processing of a formal complaint does not preclude, however, the possibility of an informal or mediated resolution of the matter.)
>
> In such cases, *unless a written complaint has already been submitted*, the individual making the complaint (the "complainant") *shall file a written, signed complaint* containing the name(s) and relevant allegations against the person (the "respondent").

(*Id.* at p. 142)(emphasis added).

26.     Allegheny's policy mandates that "[t]he Title IX Coordinator (or Deputy Coordinator) *shall* provide the respondent with a copy of the written complaint." *(Id.)*(emphasis added).

27.     Allegheny's policy mandates that "[a]ll persons concerned are to be treated with respect and impartiality." *(Id.)*

28.     Allegheny's policy mandates that "[p]rocedures are to be fair, both *in substance and in perception*, to *all* persons concerned and to the College community." (*Id.*)(emphasis added).

29.     Allegheny's policy provides that a student who is accused of sexual violence is permitted to have a community support person accompany him to the hearing.  The policy provides that "the primary role of the community support person is to assist the student in preparing for meetings/hearings and to attend the meetings/hearings as support for the student." (*Id.* at p. 109).  However, "the student is responsible for presenting his own information and, therefore, advisers are not permitted to speak or participate directly in any meetings or hearings without approval." (*Id.*)

30.     Allegheny's policy does *not* prohibit the community support person from having access to relevant information and documents, such as the complaint, witness statements or the written report containing the findings and recommendations of the Title IX Coordinator in order to fulfill the primary role of assisting the student in preparing for meetings and hearings.

31.     Allegheny's policy mandates that "[t]he investigation of all formal complaints generally includes *interviews* of (i) the complainant, (ii) the respondent, and (iii) any witnesses as needed; and (iv) review of relevant documents as appropriate." (*Id.*)(emphasis added).

31.     Allegheny's policy also mandates that "[n]o person shall make an allegation that he/she knows to be untrue or knowingly provides false information during the course in investigation or other proceeding under this policy ... [and that] [m]aking a false complaint or knowingly giving false information is a violation of this policy and may be a basis for discipline." (*Id.* at p. 143).

32.     Allegheny's policy states that the "preponderance of evidence" standard shall apply to all student cases.  (*Id*. at p. 142).  Allegheny's policy defines preponderance of the evidence as "there is substantial information indicating it is more probable than not that a student violated College policies."  (*Id.*)

33.     For faculty and staff members (but not for students) who are accused of sexual assault or sexual harassment, Allegheny's policy states that "after concluding his/her investigation, the Title IX Coordinator or his/her designee will record findings and recommendations in a written report using the 'preponderance of the evidence' standard."  (*Id.* at pp 142-143).

34.     For faculty and staff members (but not for students) who are accused of sexual assault or sexual harassment, Allegheny's policy mandates that "[t]he complainant and respondent will be informed that the investigation has been completed and will receive a copy of the written report."  (*Id*. at pp 142-143).

35.     For faculty and staff members (but not for students) who are accused of sexual assault or sexual harassment, following completion and/or receipt of the written report "the Title IX Coordinator shall recommend appropriate action in accordance with the provisions of the policy and other College policies and procedures." (*Id.* at pp 142-143).

36.     Allegheny's policy is ambiguous and/or silent about what the Title IX Coordinator's responsibilities are at the conclusion of the investigation of a sexual assault complaint made against a student, creating confusion as to how the case proceeds against the student.

37.     The student's right to due process is compromised by the lack of a policy that requires that the student be provided with a copy of the written report after the conclusion of the investigation, as opposed to the same policy that provides for faculty and staff members to receive a copy of the written report at the conclusion of the investigation against him/her as a matter of due process.

38.     The College's Title IX policy fails to set forth the Title IX Coordinator's obligations to the student at the conclusion of the investigation which constitutes an inexplicable and critical lapse in the process for providing procedures that are fair in both substance and in perception as required by Allegheny policy and results in both a denial of due process to the student and a violation of the implied duty of good faith and fair dealing in the contract between John and the College.

39.     Allegheny's policy provides that "it is understood that both the complainant and the respondent will have the right to appeal" the findings and recommendations contained in the report made by the Title IX Coordinator or her designee.  (*Id.* at p. 143).

40.     Allegheny's policy mandates that "once an official appeal has been referred to the Campus Life and Community Standards Committee, the Assistant Dean of Students will appoint a chair for the hearing [and] within five calendar days, the Assistant Dean of Students will contact the accused student and will inform the student *inter alia* that the student is to be "afforded reasonable access to the disciplinary file."

41.     Further, according to Allegheny's policy, the student is permitted "to present relevant information" [and] "the student is permitted and encouraged to bring relevant and necessary witnesses to the hearing." (*Id.* at p. 109).

-10-

42.     Allegheny's policy mandates that "the Committee will conduct a hearing to consider relevant information about the alleged violation."  (*Id.* at p. 109).

43.     Allegheny's policy mandates that "the Committee shall consist of five full-time faculty members." (*Id.* at p. 108).

44.     Allegheny's policy requires that the Assistant Dean of Students appoint a chair of the committee and that the Assistant Dean of Students be present during  the hearing.  (*Id.* at p. 109).

45.     Allegheny's policy provides that "[t]he Committee will use the standard of proof that is more likely than not a violation of Allegheny College policy occurred."  (*Id.* at p. 104). Allegheny's policy further states that "this means there is substantial information indicating it is more probable than not that a student violated College polices ... ."  (*Id.* at p. 104).  The term "substantial information" is *not* defined in Allegheny's policy.

46.     Allegheny's policy mandates that "during the hearing the Committee will listen to *all* relevant information and facts from the complainant, the accused student and any relevant and necessary witnesses to the incident."  (*Id.* at p. 110)(emphasis added).

47.     Allegheny's policy states that "the Committee may determine the relevance of information and *reasonably* limit that participation of the witnesses accordingly."  (*Id.* at p. 110)(emphasis added).

48.     Allegheny's policy states that "when the committee has heard *all* relevant information, they will enter executive session" and "after reviewing all substantial facts, the Committee will decide whether the College policy has been violated and will assign sanctions, if appropriate."  (*Id.* at p. 110)(emphasis added).

-11-

49.     Allegheny's policy states that "the committee will report the outcome to the Assistant Dean of Students, who will notify the accused student of the decision in writing within 5 calendar days from the date of the report from the committee."  (*Id.* at p. 110)

50.     Allegheny's policy mandates that "the decision of the Committee may be appealed to the President of the College by any party to the case within five calendar days of the date of the letter notifying the student of the decision of the Campus Life and Community Standards Committee."  (*Id*. at p. 110).

51.     Allegheny's policy provides that an appeal must be based upon only the two following grounds: "New facts not available at the hearing" and/or "[a] violation of the process as described in this student conduct system that significantly and materially affected the student's ability to present complete information to the Committee."  (*Id.* at p. 110).

52.     While Allegheny's policy is clear that when an appeal is based upon a violation of process that significantly and materially affected the student's ability to present complete information to the committee, the President "may uphold or overturn the decision of the committee, return the case to the committee for further processing, or reduce or retain any sanction," Allegheny's policy is silent and therefore ambiguous about what the President can do when the appeal is based upon new facts not available at the hearing (such as in the present case). *Id.*

53.     On April 4, 2011, the U.S. Department of Education Office of Civil Rights ("OCR") issued what is commonly known as the "Dear Colleague Letter" to schools such as Allegheny that receive federal funding advising schools that in order to be compliant with Title IX and thereby avoid a loss of federal funding, which according to one study could equate to a

loss of more than a half a billion dollars for a school, they, among other things, must apply a lower standard of proof when evaluating any claim for sexual harassment or sexual violence. Any school using a higher burden of proof than a preponderance of the evidence standard would be considered non-compliant and could lose federal funding.

### C.     Allegheny College under investigation by the Office of Civil Rights

54.     On December 5, 2014, a short time *before* Jane Doe falsely accused John of raping her, the OCR notified Allegheny that the College was under investigation following a complaint arising from the College's handling of a sexual assault or harassment complaint.  The complaint, filed under Title IX, generated media coverage which included criticism of Allegheny's administration and staff.

55.     In response to the federal complaints and public criticism, Allegheny's President James Mullen, Jr. admitted to the press that "Obviously this is not a list that anyone seeks to be on."  By "list" it is believed that President Mullen referenced the list of 94 colleges and universities across the nation under scrutiny for their response of sexual violence.  Allegheny's President also stated to the media *inter alia* that "[i]f we can through this process [i.e., the federal investigation] be stronger, then we will use it to be stronger."

56.     On January 22, 2015 it was reported by the media that a representative of Allegheny stated that the College was providing "[e]verything associated with every case [involving claims of sexual assault]" to OCR "for their review."

57.     It was also reported that Allegheny's President hoped that "recent changes" made by the College "to increase the College's awareness of the issue and more directly address how well it handles investigations" would be viewed favorably by the OCR.

58.     It is believed that John's case was among the first cases of alleged sexual misconduct heard by Allegheny after the federal Title IX complaints were filed and reports contained in the news media criticized Allegheny for its response to previous allegations of sexual misconduct on campus.

59.     Since the time Allegheny became the subject of an OCR investigation and instituted the "recent changes" referenced by Allegheny's President, the number of male students expelled by Allegheny following claims of sexual assaults increased dramatically. According to news reports, from 2009 to 2013, *no one* was expelled by Allegheny following allegations of sexual assault. In 2013-2014, four students were expelled for alleged sexual assault. In 2014-2015 and 2015-2016, there were seven expulsions. As such, in the four academic years before 2013-2014, no one was expelled following claims of sexual assault, then in the three academic years after "changes" in the way the College handled such claims, 11 students were expelled.

**D.     The Incident**

60.     On September 26, 2014, Jane Doe came to John's dorm floor where some of the teammates had gathered to celebrate the track team's successful time trials.  Jane Doe brought with her a bottle of tequila but did not consume any alcoholic beverages and remained sober throughout the evening.  John and Jane then went to John's dorm room.

61.     While others left John's dorm floor, Jane Doe remained in John's room and slept in John's bed with him as she had on previous occasions.  While in bed together the two had consensual sexual relations, following which Jane Doe left the dorm room on two occasions to go to the restroom down the hallway, passing the dorm room belonging to the Resident

Assistant, on both occasions.  Both times, she also could have, but did not, leave John's room without returning.  Jane Doe returned to John's bed with him where she slept until the following morning.

62.     The next day, after leaving in the morning, Jane Doe returned to John's dorm room again where she slept the following night as well.

63.     In the days and weeks that followed, Jane Doe sent numerous text messages to John and otherwise attempted to communicate with him about their relationship.  However, John largely ignored Jane Doe's text messages and her efforts to communicate with him.

**E.      Jane Doe's Initial Report**

64.     On December 6, 2014, just before winter recess, Jane Doe attended a holiday party on campus at which she saw John with another female student at Allegheny, whom Jane learned for the first time was John's girlfriend.

65.     Several days later, Jane Doe made false allegations against John accusing him of raping her on September 26, 2014.

**F.      Allegheny Conducted Unequal, Incomplete, and Gender-Biased Investigation**

66.     While on winter recess at home, John received a letter from Allegheny's Title IX Coordinator ("Coordinator Pope") informing him that he had been "accused of a violation of Allegheny College's policy against discriminatory and sexual harassment, College Policy # 4" and requested that he schedule an appointment with her immediately upon his return to campus. In the letter, Allegheny does *not* inform John of the identify of the accuser, the date, time or place of the alleged violation, or any details surrounding the nature of the alleged violation of Allegheny's policy against discriminatory and sexual harassment.

-15-

67.     Allegheny did not inform John of the identify of his accuser, the time and place of the alleged violation until January 28, 2015.  No details surrounding the nature of the allegation beyond being characterized as "non-consensual sex" was provided *until just a few days before the appeal hearing on March 24, 2015* in violation of Allegheny's policy that Coordinator Pope shall provide the respondent, such as John, with a copy of the written complaint when the formal complaint process is initiated.  Moreover, Coordinator Pope and Title IX Investigator Hall, against Allegheny's policy, engaged in a pattern of withholding this information from John while attempting to coerce a statement from him in response to allegations that had not been fully disclosed to him.

68.     In response, John informed Coordinator Pope that he would schedule an appointment upon his return to campus following winter break.

**1.     Allegheny attempted to coerce John Doe into giving an uninformed statement.**

69.     On Monday, January 19, 2015, when he returned to campus, uniformed officers employed by Allegheny's Safety and Security Department transported John in a marked campus security vehicle to the City of Meadville Police Department.  While there, Allegheny's security officers introduced John to a police detective who issued John *Miranda* warnings and requested that he provide a statement.

70.     When John requested an opportunity to consult with a lawyer, Allegheny's campus security officers transported John back to campus.

71.     On the next day, on January 20, 2015, Allegheny's Title IX Investigator ("Investigator Hall") sent the following email to John:

> I would like to schedule a meeting to discuss a recent complaint
> shared with our office.  Pursuant to Policy Against Discriminatory

-16-

and Sexual Harassment Including:  Sexual Assault, and Other
Forms of Sexual Violence, Dating Violence, Domestic Violence
and Stalking you have been named in a complaint of sexual assault
and are being asked to respond to the College's investigation of
this complaint.

In cases involving alleged violations of College Policy # 4 (Policy
Against Discriminatory & Sexual Harassment, Including:  Sexual
Assault and Other Forms of Sexual Violence, Dating Violence,
Domestic Violence and Stalking) the student may be accompanied
by an advisor of his/her choice.  Only one advisor of your choice
can be present during the meeting.  You are responsible for
presenting your own information and, therefore, advisors are not
permitted to speak or participate directly in any meetings/hearings
without approval from the convener.

For more information on our process and policies, please visit (pg.
137 of the 2014-2015 edition of The Compass).  I have provided
my contact information below and encourage you to contact me if
you have any questions.

Sincerely,

Joe Hall
Director of Student Conduct & Development

72.     On or about January 22, 2015, John and his community representative, Brian
Saltsman, met with Investigator Hall, who did *not* provide John with a copy of the complaint
made against him as required by Allegheny's policies and procedures.  Investigator Hall also did
*not* provide any information about who, when, where or other particulars surrounding the
allegation that John had violated College Policy # 4.  Rather, Investigator Hall simply informed
John that he was named in a complaint of sexual assault in violation of College Policy # 4 and
that Allegheny wanted John to respond to the allegation by providing a statement.  In response,
John stated that the allegation was not true and wanted more information in order to enable him
to respond any further or in more detail.

-17-

**2.    Allegheny violated its own policies by denying John a copy of Jane's complaint on January 22, 2015 and then continuing to withhold Jane's complaint from him.**

73.      In response to John's request for more information, Investigator Hall informed John that he would be required to provide a statement before Allegheny would provide any more information to him.

74.      On Monday, February 9, 2015, John again met with Investigator Hall and Coordinator Pope for the purpose of providing an initial statement in order to learn the particulars of the allegation made against him, as such information had not been disclosed to him and a copy of the complaint had not been provided to him in accordance with Allegheny's policy. At the meeting, Allegheny informed John of only Jane Doe's name and the date on which she alleged that a violation of College Policy occurred.  In response, John stated, "That is simply not true.  I have not had non-consensual sexual relations with anyone."

75.      In response to John's statement, Investigator Hall and Coordinator Pope informed John that such a statement must be "in writing" in order for Allegheny to provide any further information about the particulars of the allegation made against John.  Thereafter, John provided a list of possible witnesses who knew both John and Jane and might have information about her false allegation.

76.      On February 14, 2015, Investigator Hall sent an email to John as follows:

> We did receive a list of witnesses from your attorney.  *However, we have not received a statement [from you].*  If we do not have a statement [from you] by Tuesday, February 17, 2015 at 5 PM, we will continue to move forward with our investigation and when prepared make a final decision on responsibility without your statement.

> Also, I have not heard from [a student witness].  I will continue to
> reach out to him, but wanted you to know.
>
> Joseph Hall,
> Director of Student Conduct & Development

77.     On February 16, 2015, John provided Investigator Hall with a *written* statement in

response to the limited information that Allegheny had provided to him as follows:

> Dear Mr. Hall,
>
> Thank you for meeting with me on Monday, February 9, 2015
> when you told me the name of the person who accused me of
> violating the College's student conduct policy.
>
> The allegations made by [Jane Doe] that we had non-consensual
> sexual relations on September 26, 2014 is false.  I did not have
> non-consensual sex with her at anytime.  Her claim is simply not
> true.
>
> Please send me all of the information that you have gathered to
> date pursuant to the policy that governs your investigation.
>
> Sincerely,
>
> [John Doe]

78.     After John provided a written statement that Investigator Hall had indicated was

necessary in order for John to learn more about the allegation made against him, Investigator Hall

informed that the written statement was *inadequate* to result in more information being made

available to John about the particulars of the allegation.  Further, Investigator Hall informed John

that he must submit to an "interview" conducted by Investigator Hall before more information

could be disclosed to him.

79.   On February 19, 2015, John, through his lawyer and new community representative, renewed John's request to learn what Jane said happened and review the investigative file prepared by Investigator Hall as follows:

> In the meantime, I reviewed again the "Procedures for Formal Complaint Processes" found at page 142 of the Compass. There, at Paragraph C (3) it states plainly that "[t]he Title IX Coordinator for Deputy Coordinator shall provide the respondent with a copy of the written complaint." This language is mandatory (not permissive) and is unconditional. In other words, the plain language of [the] procedures that govern your investigation require you to provide [John Doe] with "a copy of the written complaint" whether he provides you with a statement (written or oral), or not.
>
> Accordingly, please provide me or [John Doe] with a copy of the written complaint made by [Jane Doe]. We request that this be provided today. We also still want to examine your investigative files sometime early next week (as your schedule allows) pursuant to our earlier discussions. Thereafter, we may have more witnesses or other information for you to consider as you search for the truth in this matter.
>
> I look forward to your response to both of the foregoing requests.
>
> [John's community support representative]

80.   On February 26, 2015, Investigator Hall responded to John's request for a copy of the complaint made against him and an opportunity to review the investigative file pursuant to Allegheny's policy as follows:

> Attached is the copy of [Jane Doe's complaint]. If you have additional statements or information related to the case, please forward to me by Monday, March 2, 2015 at 5 PM. We can schedule a time on Tuesday [March 3, 2015] to review the case file in my office.
>
> We may be able to reach a final determination by the end of next week. If you have any questions, please let me know.

Thank you,

Joseph Hall,
Director of Student Conduct & Development

81.     Accompanying the February 26, 2015 email from Investigator Hall to John was

the following, which Allegheny purported to be "the complaint" and which until then had been

withheld from John in violation of Allegheny's policy:

Filed by:  [Jane Doe] (Complainant)

Respondent: [John Doe]

Date Filed:  January 14, 2015
Formal Complaint Allegations:

Late in the evening on September 26, and into the early morning of
the 27, 2014, [John Doe] did sexually assault me.

Location:  Ravine Hall [John Doe's] room

Complainant Signature:  [/s/ Jane Doe]

82.     In addition to withholding what Allegheny purported to be a copy of "the

complaint" made against John while the College attempted to coerce statements from him before

he had been apprised of any of the particulars of the allegation, Allegheny required John to

provide *all* additional information which he wanted Allegheny to consider in the matter *before*

Allegheny afforded John an opportunity to review the investigative file, which included *inter alia*

Jane Doe's written statement.  In other words, Allegheny required John to provide a full and

complete response to the allegations before John was allowed to know the particulars of the

allegation.

3.     **Allegheny imposed unreasonable and arbitrary deadlines in an unequal manner that violated its own policies and prejudiced John.**

83.     On March 3, 2015, Investigator Hall reiterated Allegheny's demand that John

provide all of the information that John wanted Allegheny to consider before making a final

determination about whether or not a College Policy #4 violation occurred *before* John had

opportunity to review the investigative file prepared by Investigator Hall concerning the

complaint.  On that date, the Investigator sent another email to John as follows:

> I need to receive the additional information before our 3 PM
> meeting today or before your review of the case file.  Can you
> forward this to me?  Please let me know if you have any questions?
>
> Thank you,
>
> Joe [Hall]
> [Director of Student Conduct & Development]

84.     In response, John sent the following email to Investigator Hall later the same date:

> Thank you for your email.  I value being a student at Allegheny
> College and want to work within the process to resolve this.
> *Please remember that I still have not been informed of the specifics
> of the allegation made against me.  It is impossible to respond
> adequately without knowing everything that has been said about
> me.*  This is why reviewing your investigative file is so important to
> me.  I have additional information and would like an opportunity to
> gather and provide even more information to you.  But I can't
> respond fully and adequately unless I know more about what has
> been said about me.
>
> I don't see anything in the Compass [i.e., Allegheny's policies &
> procedures] that I am required to provide all additional information
> before being allowed to review the investigative file.  *Where do
> you believe the requirement that I provide you with all additional
> information before the school will let me know what has been said
> about me in your investigative file is stated in the policies and
> procedures?  It feels like the school is not being fair to me.  It is
> not fair that you insist that I give you a full response without your
> first letting me know everything that has been said about me.  And*

*it is not fair to make me if the procedures don't require it.* If there is something in the Compass that requires me to give you a full response to the allegation before we review your file, I will tell my community representative to get you more information. He has it. Please let me know soon so that I can inform my community representative before he travels to school today. If there is nothing in the Compass about this procedure, please let me provide more information after I can learn everything that has been said about me.

Thank you,

[John Doe]

85.    Investigator Hall responded to John in an email as follows:

I would like to clarify any confusion. We have shared with you on two occasions the potential policy violation and the specific allegations. You sent me a statement on, 2/16/15, denying these allegations. The purpose of our meeting today is to review her actual statement and witness statements.

You may provide me additional information at any point during the investigation. If you have information to present today, we should review this first before you review the case file. We can discuss all items today in our meeting. You could provide more information after our meeting today if you choose.

The information must be provided by you though and not your community support person.

Thank you,

Joseph Hall
Director of Student Conduct & Development

86.    Later the same date on March 3, 2015, John and his community support representative met with Investigator Hall and Deputy Title IX Coordinator Jaquelyn Kondrot ("Deputy Coordinator Kondrot") for the purpose of allowing John and his community support representative their first opportunity to review the complaint made by Jane Doe and witness statements obtained by Investigator Hall.

4.      **Allegheny denied John meaningful assistance from his community support representative in violation of its own policies which prejudiced John.**

87.      By contrast, Investigator Hall did not impose similar deadlines upon witnesses he viewed to be favorable to Jane's claim, allowing them to submit written statement without any such constraints.

88.      More than a month earlier, John's community support representative had signed a confidentiality agreement prepared by Allegheny, ostensibly for the purpose of allowing John's community support representative to receive what was otherwise private information arising from Jane Doe's complaint in the course of supporting and advising John during the formal complaint process.  However, on the date and time set for reviewing the investigative file, Deputy Coordinator Kondrot and Investigator Hall *prohibited* John's community support representative from reviewing *any* portion of Allegheny's investigative file.

89.      Further, on the date set to review the information that Investigator Hall had assembled, Allegheny prohibited John from either reading the investigative file to his community support representative, or making copies of the witness statements and other materials in the file. As such, Allegheny denied John any meaningful support from his community support representative because without knowing what was contained in the file assembled by Allegheny the community support representative could not provide John with any meaningful guidance or direction as contemplated by Allegheny's policy which defines the "primary role" of a community support representative as "assist[ing] the student in preparing for meetings/hearings ... ."  (*See*, Student Handbook, p. 109).

90.     The harm caused by Allegheny's denial of meaningful support, advice and direction to John from his community support representative was compounded by Deputy Coordinator Kondrot and Investigator Hall prohibiting John from taking detailed notes while reviewing the information.  In fact, Deputy Coordinator Kondrot threatened to destroy John's notes if, in her judgment, they were "too detailed."  Deputy Coordinator Kondrot and Investigator Hall closely monitored John's writing while reviewing the investigative file in order to enforce their admonition, and on multiple occasions inspected his notes to ensure that the notes (upon which he was expected to rely when seeking advice from his community support representative, conduct his own investigation, prepare a defense or response to the allegation, and prepare questions for witnesses at an appeal hearing *inter alia*) were not too detailed or contained too much information.  This pattern of conduct by Allegheny was obviously calculated to pressure John, hurry him, and prevent him from gathering the information necessary to understand the details of the allegation, process the information, make sense of his notes, and later discuss the details with his community support representative in order to prepare a full and complete response to the allegation, offer all relevant information in his defense,  and receive a fair hearing on Jane's false allegation.

**5.     Allegheny engaged in a pattern of conduct and employed methods, including arbitrary deadlines, unreasonable notice,  and unfairly withholding information, which violated its own policies, all of which denied John a meaningful opportunity to defend himself against Jane's false claim.**

91.     Further, when John read and attempted to re-read the various witness statements in order to commit more to memory because he was not permitted to write in detail, he was hurried by Coordinator Pope and told that he could come again and read the statements at another time.

92.     Despite being pressured to hurry and invited to return on another day if he needed more time, Investigator Hall had told John on more than one occasion earlier that his recommendation would be announced later the same week, i.e., within a few days.  As such, John could not afford to wait any longer to learn the details of the allegation or what other people who had been interviewed by Investigator Hall had said concerning the allegation because gathering such information was necessary to prepare a full, complete and effective response.

93.     On the same date, after attempting to review Allegheny's investigative file for the first time with the impediments described above, John received an email from Investigator Hall informing that he had only until *the next day at noon* to provide any additional information in response to the information contained in Allegheny's investigative file.  The email, sent Tuesday, March 3, 2015 at 5:03 p.m., stated as follows:

> Hi [John],
>
> This is a follow up to our conversation today.  You have until Wednesday, March 4 at 12 PM EST to provide any additional information for our investigation.  If you have any questions or would like to schedule more time to review the file let me know. I appreciate your time to date.
>
> Thank you,
>
> Joseph Hall
> Director of Student Conduct & Development

94.     By requiring John to provide all additional information by noon the next day in response to the information he had just read for the first time while being prohibited from taking notes that were meaningful or "too detailed," Investigator Hall denied John the opportunity to fully and fairly respond to Jane's claim and Allegheny's investigation.  Thus, Investigator Hall ensured that Allegheny's investigation would be incomplete and one-sided.

-26-

95.     The next day on Wednesday, March 4, 2015, John responded to Investigator

Hall's email as follows:

> In the statement that I was able to read yesterday [for the first
> time], [Jane Doe] gives a completely false account of what
> happened.  You told me at about 5:00 PM that I could provide you
> with additional information but that it had to submitted by Noon
> today.  I cannot meet this deadline for a few reasons.  You gave me
> short notice.  I have been in class this morning from 9:00 AM to
> 11:15AM.  I cannot effectively convey what [Allegheny's
> Representative Title IX Coordinator] Ms. Condrot warned me
> against taking notes that are too detailed.  I need more time to
> reread the statements so that I can process and understand the
> details contained in these statements.  I would like to take you up
> on your offer to see the file again because I am having difficulty
> understanding and conveying to my community representative the
> limited notes that I made yesterday at your instruction.
>
> May I please review the file again tomorrow @ 1 PM due to my
> class schedule and may I have two business days after that review
> to provide an additional response?"
>
> [John Doe]

96.     Investigator Hall responded by email to John as follows:

> Hi [John Doe],
>
> On, March 3, 2015, you wrote to me via email and reported you
> had additional information to provide.  You did not provide this
> information in our meeting yesterday.  I will extend your deadline
> until 9 AM tomorrow and I am happy to meet with you at 1:15 PM
> to review the file again.
>
> I will review any new information tomorrow and would like to
> schedule time on Friday, March 6, 2015 to make a final
> determination.  Please let me know your availability and I will send
> you a formal meeting notice.
>
> Thank you,
>
> Joe
> [Allegheny's Title IX Investigator]

97.     On Wednesday, March 4, 2015 at 12:45 PM, shortly after receiving the email

from Investigator Hall, John wrote an email in response requesting more time to review the

information and prepare a complete response as follows:

> Dear Mr. Hall,
>
> I want to see the file again like you offered.  But I have class today
> from 1-3:30.  May I see the file tomorrow at 1 after my morning
> classes?  May I have until Monday to consult my community
> representative before providing more information?
>
> Thank you,
>
> [John Doe]

98.     Later on the same date, Investigator Hall denied John's request and demanded a

comprehensive response from John by the next morning despite John not completing his review

or having an opportunity to complete his own investigation and being denied any meaningful

aide from his community support representative.  Investigator Hall responded to John by email as

follows:

> Hi [John Doe]
>
> I did mean Thursday at 1:15 PM.  Again, we need any additional
> information by tomorrow (March 5) at 9 AM.
>
> I will see you tomorrow.
> Thank you,
>
> [Joe, Allegheny's Title IX Investigator]

99.     On Thursday, March 5, 2015 at 7:56 AM, John sent the following email to

Investigator Hall:

> Dear Mr. Hall,
>
> Here is the statement given by Ben Evans on 1/27/15 to our
> investigator, Chuck Bowers, who is a retired police officer and

-28-

former Chief of Police for the City of Erie Police.  In his interview with Mr. Bowers, Ben said that:

1.      He and [John Doe] are no longer roommates.
2.      [Jane] and [John] frequently slept together while he was sleeping in the same room.
3.      They weren't having sex, usually just cuddling or just making out.
4.      He is of the opinion that [Jane Doe] is "not stable" and would go on walks around downtown Meadville alone at 2 AM.
5.      She cried frequently at track practice even before the alleged incident.
6.      On Friday, 9/26/14, he was in the room with [John Doe] when [Jane Doe] came in with a full bottle of tequila.
7.      [John] was not drinking heavily" [Jane] stayed in the room but did not drink.
8.      Ben left the room with his friend, Jackie for "privacy" and when he returned his door was locked.
9.      He assumed that [John] and [Jane] were inside so he just left and went back to Jackie's room where they both fell asleep.
10.     He went back to his room late on Saturday morning and didn't recall seeing [Jane] in the room.
11.     On Saturday night, 9/27/14, he was asleep in his room when he heard [John] and [Jane] come in. [John] was heavily intoxicated and [Jane] was holding him up as a trainer would help an injured player off the field of a football game. [Jane] put him in his bed and she laid down with him.
12.     On Sunday, he and [John] got up at 9 AM for a training run. [Jane] was in the room when they left.
13.     A couple of weeks later he heard talk on the team that [Jane] was telling people that [John] forced himself on her on the Friday night time period.
14.     [Jane] is known for not being an honest person.
15.     The general opinion of the track team is that [Jane] is not honest.
16.     [Jane] is constantly being less than truthful.
17.     He feels [John] is an honest guy.
18.     He's never known [John] to be aggressive with girls or anyone else.

*When I have had an opportunity to read the file again this afternoon, read the statement given by Brittany Adams (which you did not have on Tuesday) and have had time to consult with my community representative, I may have even more information to present.*

Thank you,

[John Doe]

100.     Investigator Hall responded to the email from John as follows:

Hi [John]

I do have the statement from Brittany and I will include your new information with the case file for my review. Please come prepared at 1:15 PM today [March 5, 2015] with your availability for a meeting tomorrow [March 6, 2015].

Thank you

[Allegheny's Title IX Investigator]

101.     On March 6, 2015, *less than one day* after John was permitted to review the statements contained in Allegheny's investigative file, Investigator Hall informed John that he had concluded that John was responsible for participating in non-consensual intercourse with another student and violating College Policy #4: Sexual Misconduct and that as a result of the incident, John will be expelled from Allegheny College. Investigator Hall also informed John in writing the same date in a two page letter.

102.     On March 10, 2015, John informed Investigator Hall that he would appeal the decision.

103.     On March 12, 2015, Coordinator Pope sent the following email to John:

Mr. [Doe],

Joe Hall shared with me your letter of intent to appeal the determination of a violation of College Policy #4, Sexual Misconduct.

Per College Policy, I am working on scheduling the appeal hearing with the Campus Life and Community Standards Board. You have the option of attending in person or joining the hearing by phone. Ms. [Doe] also has the option to attend. I would appreciate it if you could notify me by email of your intent to attend the appeal and if you plan to do so by person or by phone. We are currently hoping to hold the panel on Tuesday, March 24 in the afternoon.

I would also remind you that you have the right and are encouraged to have a Community Support Person or other advisor of choice accompany you to any pre-hearing, meetings and to the hearing itself.

Finally, if you have additional questions regarding how the hearing process works and would like access to review your original case file prior to the hearing date, we can schedule a time to meet with you and go through this information.

Once we have confirmed the hearing date, I will be back in touch to confirm your preference for participation, if you will have a support person or advisor accompany you, and any additional questions that you may have. In the meantime, please do not hesitate to contact me with questions.

Regards,

Katie Pope
Title IX Coordinator

104. Later on the same date, John responded by email to request time to complete his review of the information assembled by the College after spring break when Investigator Hall was available to share the file with him as follows:

Ms. Pope,

I ask that the hearing be moved to no earlier than Thursday, March 26. I ask this because spring break starts tomorrow and since I get

back to campus on the 22nd I would only have one full day to
prepare for the hearing.  This is not enough time because I wish to
look at and take notes on Mr. Hall's investigative files again.

Thank you,

[John Doe]

105.    The next day on March 13, 2015, Coordinator Pope denied John's request and

directed that he complete his review just *one day* before the hearing in the following email:

Greetings,

The appeal panel for Policy #4 matter is set for *Tuesday, March 24
at 1:45.*  Please arrive at my office in Bentley 201 by 1:30.

The panel members are as follows:

Zach Callen, History
Wendy Kedzierski, Creek Connections
Belinda Nichols, Development
Lisa Whitenack, Biology

Please let me know right away if you have any conflicts with these
panel members.

This office will arrange for witnesses in the investigative report to
be present.

*The file will be available for review beginning Monday, March 23
at 8 AM.*

Please advise as to when you wish to come in to review the
material.

Please let me know if you have any additional questions or would
like to discuss the panel proceeding.

Regards,

Katie Pope
Title IX Coordinator

-32-

106.    On March 18, 2015, John sent an email to Coordinator Pope both to inform of

additional witnesses and to address his frustration with the inability to complete his review of the

file that Allegheny had assembled, which denied him a reasonable opportunity to process,

investigate and respond to the false allegation made by Jane as follows:

> Ms. Pope,
>
> Thank you for your answers to my questions.  In accordance with
> your email, the names of the additional witnesses are Austin Glick
> and Marissa Sly [witness three and witness four].  They will testify
> that [Jane Doe] has a reputation for lying and has lied to them.
> They will testify that she is obsessive and was so with me.  This is
> relevant because [Jane Doe's] credibility is at issue here, and she
> reported this claim to Allegheny College only after she saw me
> with another girl in December.  *I would like to see the investigative
> file and the investigative report this week so that I can have a
> reasonable opportunity to prepare for the hearing.  I don't think
> seeing the report for the first time one day before the hearing is
> reasonable or fair.  I feel like you have taken her side from the
> beginning and been unfair to me by withholding information, not
> letting me have [Jane Doe's] statement until just a short time
> before a decision was made, setting unreasonable and arbitrary
> deadlines for me to meet, ignoring witness statements which cast
> doubt upon the allegation, and by rushing to a decision before I
> was given a reasonable opportunity to process, investigate and
> respond to this false allegation.*
>
>
>
> Please give me an opportunity to review the investigative file and
> see the investigative report this week.  *After I review the
> investigative file it is possible that I will have additional witnesses.*
> Thank you,
>
> [John Doe]

107.    Coordinator Pope ignored this email and never addressed with John his concerns

that Allegheny's process was unfair to him and biased in favor of Jane.  Moreover, no one at

Allegheny responded to his specific complaints about Allegheny's withholding of information, not letting him see Jane's statement until just a short time before Allegheny made a decision to expel him, setting unreasonable and arbitrary deadlines, ignoring witness statements which cast doubt upon the allegation and Jane's veracity, and by rushing to a decision before John was given a reasonable opportunity to learn, process, investigate and respond to Jane's false allegation.

108.    Further, Coordinator Pope never responded to John's request to review the investigative file and see the investigative report in the week preceding the appeal hearing. Instead, Allegheny refused to provide John with additional access to such information until just one day before he was expected to defend himself at the hearing without any meaningful assistance from his community support representative.

**6.      Allegheny failed to interview, and refused to allow testimony from, a key witness that proved that Jane's allegation was false and made in an effort to manipulate Allegheny's policy.**

109.    On March 23, 2015, the day before the hearing scheduled by Coordinator Pope, Jane's friend came forward and revealed a conversation that she had with Jane in which Jane disclosed her motive for falsely accusing John of rape.  As soon as John discovered this witness, he sent the following email to Coordinator Pope and Investigator Hall as follows:

> Dear Ms. Pope & Mr. Hall,
>
> Megan Weaver was identified this afternoon as someone having relevant information about the allegation made against me by [Jane Doe].  Our investigator interviewed her this evening and she says that:
>
> "She is friends with [Jane Doe]."
>
> "She talked to [Jane] in December of 2014 at N. Tonawanda HS." "During this conversation [Jane] said that 'she had sex with [John Doe]' but did not say if it was consensual or not, just implied that it happened."

"[Jane] is upset because [John] will not talk to her anymore and she can't stand being at the same school with him."

"She doesn't want to leave Allegheny, so the only way to get him out was to claim that he raped her and to press charges."

"She feels that [Jane] is wrong and falsely accused [John].  That's why she came forward with this information."

Megan Weaver is available tomorrow between 2:35 and 3:15.  Her statement is attached.  Please put her on the list to be called.

Thank you,

[John Doe]

110.    John's email to Coordinator Pope and Investigator Hall also included the

statement obtained from [Megan Weaver] which was prepared by John's investigator and set

forth, in pertinent part, the following:

I identified myself to Megan Weaver and informed her that I was interviewing the alleged incident at Allegheny College between [Jane Doe] and [John Doe].  She was already familiar with it.

She went on to state that in December of 2014 she had a conversation with [Jane Doe] in the auditorium of N. Tonawanda HS.  She considers herself as being a close friend of [Jane] and also to her sister [Jane Doe's sister].

Megan told me that she felt that [Jane] was obsessed with [John] before they went to college and even when he did not treat her nicely, she would still follow him around constantly.

Concerning the incident from 9/26/14, [Jane Doe] did not tell Megan if it was consensual or not, she just implied that it happened.  [Jane] told her that she is upset because he will not talk to her anymore and she can't stand being at the same school with him.  She said she doesn't want to leave Allegheny, so the only way to get him out was to claim that he raped her to press charges. Megan is friends with [Jane Doe] and [Jane Doe's sister] but she still feels that [Jane] is wrong for falsely accusing [John], that's why she came forward with this information.

-35-

> I asked her if she would be willing to tell this to Allegheny College
> personnel during a conference call tomorrow and she said she
> would.  She is available to talk between 2:35 and 3:15 PM.

111.    Coordinator Pope and Investigator Hall did not respond to the email sent by John

and never interviewed Megan.

112.    On March 24, 2015, at the hearing convened by Coordinator Pope, four members

of Allegheny's faculty comprised a panel that heard John's appeal from the decision and

recommendation for expulsion made by Investigator Hall.

113.    On March 24, 2015, Coordinator Pope denied John's request to call Megan

Weaver to testify at the hearing before the panel.  Coordinator Pope informed John of her

decision only after the hearing had begun, following an opening statement by Investigator Hall

and John's own opening statement.

    **7.**　　**The hearing convened by Coordinator Pope was gender-biased, incomplete, fundamentally unfair to John, and denied John even minimal due process protections.**

114.    In violation of Allegheny's policy, only four (rather than five) full-time faculty

members were appointed by Coordinator Pope to the Campus Life and Community Standards

Committee ("Committee") that heard John's appeal.

115.    It is believed that the Assistant Dean of Students did not appoint a chairman of the

committee as required by Allegheny's policy.

116.    It is believed that the Assistant Dean of Students was not present at the hearing as

required by Allegheny's policy.

117.    At the hearing, Investigator Hall presented the case for expulsion, and John

represented himself.   John's community support representative was permitted to attend the

proceeding and passed notes to John; however, the community support representative could not speak at any time during the proceeding.

118.     Investigator Hall and the committee members were permitted to ask questions of witnesses.  By contrast, John was required to write each question on an index card and Coordinator Pope asked John's questions for him. John was not permitted to submit a series of written questions to be read in succession. John was required to write only one question at a time. While writing his questions, Coordinator Pope encouraged others to ask questions which resulted in inquiries into unrelated topics. Thus, John's examinations were disjointed, lacked continuity, and his points were lost in the interruptions created by Coordinator Pope.

119.     Further, when Investigator Hall questioned witnesses, Hall was permitted to complete his examination without interruption.  On the other hand, when John questioned witnesses (through written questions asked by Pope), Coordinator Pope interrupted him and directed that either Investigator Hall or various members of the panel ask questions of the witness *before* John had concluded his line of questioning.  Such interruptions resulted in a disjointed examination of the witness and caused the points being made by John to be lost in the confusion created by Coordinator Pope.

120.     In addition, while Investigator Hall was permitted to comment and render his personal opinions about the credibility of witnesses (and did so at various times throughout the hearing) John was prohibited from commenting on the credibility of witnesses.  Further, John was prohibited by Coordinator Pope from offering testimony or any evidence about the credibility of witnesses despite the credibility of Jane Doe being the central issue of the proceeding.  Such a prohibition imposed by Coordinator Pope was unduly prejudicial and

unequal to John because a number of Jane Doe's friends and/or teammates reported to Investigator Hall that Jane had a reputation for lying.

121.    At the hearing, Coordinator Pope prohibited John from fully questioning witnesses, including Jane Doe, calculated to offer complete information to the committee as permitted under Allegheny's policies. Such questions that John was prohibited from asking included questions about facts that demonstrated that matters she asserted to be true in her testimony and in her written statement were, in fact, false (i.e. showed Jane was not credible). When John attempted to question Jane in such a manner (through written questions asked by Pope), Coordinator Pope (after reading his questions to herself) interrupted John or refused to allow the question while announcing that the question called for an answer that was not relevant (despite the questions directly exposing Jane's lack of credibility) or, in the alternative, announcing that the question called for an answer that was contained in the written materials already provided to the panel and, thus, was not an appropriate question.  By contrast, Investigator Hall was not only allowed to testify about the credibility of witnesses, Investigator Hall was also permitted to ask questions that elicited information already found in the written statements.  Thus, Coordinator Pope's rulings in this fashion resulted in the committee being re-directed away from John's challenges to Jane's credibility and being directed to information that was unfavorable to John. The prejudice to John was compounded because such partiality to Jane's claim by Coordinator Pope caused the committee to both read and hear the same unfavorable information about John. Further, such rulings resulted in much of the exculpatory information favorable to John being only read and not heard from the witnesses.

122.     In the written statement prepared by Jane Doe in which she alleges that John raped her, Jane characterized the incident as forcible sexual intercourse, or rape by both force and threat of force.  In her written statement, Jane describes the door being blocked with furniture, John, and other barriers preventing her escape.  At the hearing, John established through his questioning that Jane left the room on two occasions to go to the restroom and that Jane passed the room for the resident assistant on both occasions and did not report an assault (or an incident of any kind) or leave the residence hall when she was able to do so on these occasions.  Instead, John established that Jane returned to John's room on both occasions and slept with him in his bed that night (when Jane Doe said the incident occurred) as well as the following night.  After John established these facts, through his questioning, Coordinator Pope interrupted the hearing and injected a novel theory of culpability into the proceeding.  When it became apparent that the allegation of rape or sexual intercourse by force or threat of force was not supported by the uncontested facts, Coordinator Pope announced to the panel in the course of John's questioning of Jane that this case was about John "coercing" Jane despite nothing in the record that supported this theory.

123.     When John attempted to question Jane about their relative height, weight and strength Coordinator Pope again interrupted the proceeding, announcing that these questions were not relevant despite Jane claiming that she was subjected to sexual intercourse by force or threat of force despite the fact that Jane Doe is considerably larger and stronger than John Doe.

124.     At the hearing, despite the interruptions and unequal application of procedure, concerning John, Coordinator Pope admonished John in the presence of the panel that he was asking "too many questions."  This had the effect of both preventing John from eliciting

relevant, complete, and favorable information and also injecting Coordinator Pope's personal beliefs and opinions into the proceeding.

125.     After withholding information from John throughout the investigation, both Investigator Hall and Coordinator Pope argued to the panel that John was dilatory in providing his response to the allegation, and both argued to the panel that such delay in providing the complete response to the allegation undermined John's credibility.

**8.     Allegheny's President denied John a meaningful appeal following the flawed investigation and gender-biased hearing.**

126.     The Allegheny Student Handbook sets forth Allegheny's policies and procedures which permit a student to appeal the outcome of a hearing to the College President, James H. Mullen, Jr.  Such an appeal must be based on new facts not considered by the committee or upon violations of the process established by Allegheny's policies and procedures which govern the student conduct system.

127.     On March 28, 2015, John filed a timely appeal based upon both new facts of which Coordinator Pope and Investigator Hall were aware but refused to allow the committee to hear or consider, and upon violations of the process set forth in student conduct system. (*See*, Appeal, March 28, 2015). In the appeal, John explained that Investigator Hall failed to interview Megan Weaver whose information cast grave doubt upon Jane's claim and proved Jane's motive to fabricate her claim. John also explained that Coordinator Pope prevented Megan Weaver from testifying before the committee despite a detailed proffer being provided by John in advance of the hearing. John explained that the committee therefore never considered this critical information. John further explained how the manner in which

Coordinator Pope ruled during the hearing effectively denied John a fair opportunity to present complete information. In the appeal John also identified the policies established by Allegheny that the College failed to follow which resulted in a flawed and biased investigation and hearing.

128.    On March 29, 2015, John submitted an addendum to his appeal to Allegheny's president.  (*See*, Addendum to Appeal, March 29, 2015.  In the addendum to the appeal, John described other examples of how Allegheny violated its own policies and procedures while demonstrating partiality to Jane Doe. In particular, John described how Coordinator Pope, while injecting her own personal bias, changed the nature of Jane's allegation when information favorable to John called in to question Jane's credibility.

129.    On April 1, 2015, John submitted a second addenda to his appeal to Allegheny's president.  (*See*, Second Addenda to Appeal, April 1, 2015.  In the second addenda to the appeal, John identified another witness who came forward with new information further casting doubt upon Jane's story. Amy Amendola, Jane's roommate, contacted John after the committee hearing with photographs and other information that demonstrated that Jane is "a liar" and continued to display pictures of herself with John in her dorm room, even after the hearing before the committee.

130.    On April 17, 2015, President Mullen notified John by letter that he upheld the hearing committee's decision, including the sanction of expulsion and denied John's appeal.

**COUNT I**
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.)**

131.    John incorporates each of the above paragraphs as if fully set forth herein.

132.    Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of , or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

133.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The College is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

134.    Under Title IX, schools must "[a]dopt and publish grievance procedures providing for the *prompt and equitable resolution of student . . . complaints* alleging any action which would be prohibited by [Title IX or its regulations]." 34 C.F.R. § 106.8(b) (emphasis added). Both the Department of Education and Department of Justice have set forth this requirement by way of regulation. *See* 34 C.F.R. § 106.8(b) (Dep't. of Education); 28 C.F.R. § 54.135(b) (Dep't. of Justice).

135.    In 2001, the Office of Civil Rights (OCR) of the Department of Education, the office that administratively enforces Title IX, promulgated regulations pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance"). Title IX's regulations, including the 2001 Guidance, have the force and effect of law, because they affect individual rights and obligations and were the product of notice-and-comment rulemaking.

136.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable . . . ." *Id.* at 22. These elements apply to private and public colleges and universities and include:

"Notice to students . . . of the [school's] procedure"

"Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"

*Id.* (emphasis added).

137.    OCR's 2001 Guidance further stated that "according due process to both parties involved, will lead to sound and supportable decisions." *Id.* 22 (emphasis added).

138.    Title IX bars the imposition of college discipline where gender is a motivating factor.

139.    Both on their face and as applied in this case, the College's Disciplinary Procedures violate Title IX.  The violations include, but are not limited to, engaging in selective enforcement and reaching an erroneous outcome.

140.    Throughout the disciplinary process, the College treated John unfairly because of his sex, including, among other things, by failing to give John proper notice of the charges against him; failing to give him basic due process protections such as the right to confront his accuser, to receive copies of relevant evidence, and to present witnesses and other evidence on his own behalf; and by conducting an inadequate, unreliable, and biased investigation of the complaint against him.

141.    The investigative team's one-sided investigation demonstrated pervasive gender bias against John and in favor of Jane.

142.     The College's institutionalized gender bias against males accused of sexual assault results from classifications based on archaic assumptions. The College treats female complainants differently than male respondents based on the College's outdated attitudes about females and overly broad generalizations about male and female sexual traits and behaviors.

143.     The outcome of the College's flawed proceeding against John was clearly erroneous, and was motivated on the basis of sex. The College was on notice of, and was deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infused the process. The implementation of the Disciplinary Procedures was motivated by and premised on archaic assumptions and stereotypical notions of the sexual behavior of male and female students - i.e. male students are perceived as sexual aggressors and perpetrators and female students are perceived as sexual victims.

144.     The College's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

145.     The College has punished John with its most severe sanction - expulsion and a permanent record of the alleged violation - with no credible evidence and as a result of a process that contains virtually no procedural safeguards for accused students and is permeated with gender bias.

146.     As a direct, proximate, and foreseeable consequence of the College's aforementioned Title IX violations, John has sustained and will continue to sustain significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

-44-

147.     In the context of sexual assault cases, the Disciplinary Procedures' deficient process is deliberately designed to subject male students as a group to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always, male, and the Disciplinary Procedures on their face and as implemented by the College intentionally accord unequal treatment to them.

148.     Allegheny's Policy #4 as conceived and implemented by the College is designed to favor female accuser and disfavor the accused male by, among other things, eliminating from the process the most fundamental procedural safeguards for the accused.

149.     Allegheny's Policy #4 was developed in an effort to appear tough on the so-called campus rape culture.

150.     Information concerning outcome of disciplinary proceedings involving male students as compared to female students is in the exclusive possession and control of the College.

151.     Upon information and belief, statistics within the exclusive possession and control of the College will show a pattern of intentional discriminatory conduct and selective enforcement.

152.     As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against the College for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, injunctive relief, attorneys' fees, expenses, costs and other appropriate relief.

## COUNT II
### (Breach of Contract)

153.     John Doe incorporates each of the above paragraphs as if fully set forth herein.

154.     At all times relevant hereto, a contractual relationship existed between Allegheny and John through, *inter alia*, Allegheny's Student Handbook (The Compass), including, but not limited to, the provisions of the Student Conduct Policies, the Code of Conduct and the Policy against Discriminatory and Sexual Harassment including: Sexual Assault and Other Forms of Sexual Violence, Dating Violence and Stalking (Policy #4).

155.     Allegheny was required to act in accordance with the Compass, which was its Student Handbook, in addressing complaints of sexual misconduct, conducting investigations of such complaints, adjudicating sexual misconduct charges, and deciding requests for appeal.

156.     Through the documents it publishes and provides to students, Allegheny makes express contractual commitments to students involved in a disciplinary process.

157.     Allegheny promises to students that, "ours is community built around mutual respect and integrity." Allegheny Student Handbook (The Compass) (Ex. A, p. 4).

158.     Allegheny promises to students that, "all disciplinary decisions related to the Student Conduct System are based on a review of relevant information and facts," (Ex. A, p. 104.)

159.     Allegheny promises students in its written Title IX process to treat students, as follows:

> The following general principles and procedures shall govern this process, to the extent consistent with the College's legal obligations:

1.     All persons concerned are to be treated with respect and impartiality.
2.     Procedures are to be fair, both in substance and in perception, to all persons concerned and to the College community.
3.     The Title IX Coordinator (or Deputy Coordinator) shall provide the respondent with a copy of the written complaint.
4.     The investigation of all formal complaints generally includes interviews of (i) the complainant, (ii) the respondent, and (iii) any witnesses as needed; and (iv) review of relevant documents as appropriate. Disclosure of facts to non-party witnesses shall be limited to what is reasonably necessary to conduct a fair and thorough investigation.
5.     Both the complainant and respondent will be given an opportunity to be heard, to provide documentation and other evidence, and to suggest the names of other persons who they believe might have relevant information. The complainant and respondent will be provided equal access to relevant information and documents.

See Ex. A, pp. 142-143 (PROCEDURES FOR FORMAL COMPLAINT PROCESS)

160.     Allegheny promises that students will not be discriminated against on the basis of, *inter alia*, sex or gender. (See Ex. A, p.137, which Allegheny sets forth under its Statement of Policy, as part of its Policy against Discriminatory and Sexual Harassment including: Sexual Assault and Other Forms of Sexual Violence, Dating Violence, Domestic Violence and Stalking. (Policy # 4).)

161.     Allegheny promises students that its Title IX Coordinator and Deputy Coordinators are responsible for, among other things, "overseeing reports and complaints brought forward under this policy to assure that these matters are handled appropriately and effectively." (See Ex. A, p. 140.)

162.     Allegheny promises students they can appeal to the President from a decision rendered on the basis of non-academic conduct at a Campus Life and Community Standards Committee hearing on the following grounds:

- New facts not available at the hearing. If the facts were withheld during the original hearing by the person presenting the appeal, it may not be brought forward as a ground for appeal.
- A violation of the process as described in this student conduct system that superficially and materially affected the student's ability to present complete information to the committee. The President may uphold or overturn the decision of the committee, return a case to the committee for further processing, or reduce or return any sanction.

(See Ex. A, p.110, describing ARTICLE IV: NON-ACADEMIC CONDUCT, Section 5: Appeal to the President, B.)

163.    Allegheny's policy set forth in the preceding paragraph is silent as to what the President's options are or what he can do when a student appeals a non-academic decision from a committee hearing on the ground of "new facts not available at the hearing."

164.    By contrast, Allegheny's written policy provides that, when the decision appealed to the President involves an academic matter **on either of the two grounds for appeal**, "The President may uphold or overturn the decision of the committee, return a case to the committee for further processing, or reduce or retain any sanction." (See Ex. A., pp 107-108, describing ARTICLE III: ACADEMIC CONDUCT, Section 5: Appeal to the President, B. and C.)

165.    Allegheny's written policy on the subject of taking an appeal to the President involving a non-academic matter on the ground of "new facts not available at the hearing" is silent as to what the President can do and creates ambiguity for the students and for the President, fundamentally depriving a student such as John from receiving fundamental fairness, due process under the schools's policy and depriving him of the implied duty of good faith and fair dealing in the contract between Allegheny and John.

166.    Allegheny, through its investigators, agents and employees, including but not limited to its Title IX personnel, was required to act in accordance with its policies and

-48-

procedures in notifying John of the allegations made against him, the College's charges against

him, and the opportunity to properly review the investigative file so he could properly prepare to

defend himself at his hearing; in conducting its investigation, in applying the provisions of the

Student Conduct Policy and the Policy Against Discriminatory and Sexual Harassment; in failing

to provide John with a copy of the written complaint; in failing to give John equal access to

relevant information and documents; in failing to treat John impartially; in failing to define what

"substantial information" means in applying the preponderance of the evidence standard in its

policies; in failing to follow procedures in a fair manner; in failing to provide John with the

proper opportunity to be heard, and to provide documentation, witnesses and evidence at his

hearing; in failing to provide John with the right to effectively appeal the Committee's decision

to the President because newly discovered exculpatory evidence was not considered and because

of the ambiguity in Allegheny's written procedures for taking an appeal to the President.

167.    For all the reasons set forth above, Allegheny has materially breached its

contracts with John by failing to comply with policies and procedures governing sexual

misconduct proceedings set forth in the Student Handbook.

168.    In addition to the express contractual obligations between the College and John

referred to throughout this Complaint, there is an implied duty of good faith and fair dealing in

the contracts between the College and John, which was violated repeatedly as a result of the acts

and omissions described herein.

169.    As a direct, proximate and foreseeable consequence of Allegheny's numerous

material breaches, John has sustained significant damages including, but not limited to, having an

academic and/or disciplinary record(s) that improperly includes documentation indicating that he

was found to have committed sexual misconduct, harassment and/or other related offenses.

170.    The black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he maintains a record that notes findings of guilt for conduct he did not commit. John has also suffered monetary damages, loss of education opportunities, and other direct and consequential damages.

171.    John is entitled to recover damages for Allegheny's breach of its contractual obligations and duties.

WHEREFORE, Plaintiff John Doe, respectfully requests that his Honorable Court enter judgment in his favor against Allegheny and provide the following relief:

(a)    Mandate that Allegheny correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Allegheny and/or Jane;

(b)    Mandate that Allegheny verify this correction by providing John with a notarized letter confirming that any findings with respect to these charged have been expunged from John's academic and/or disciplinary record.

(c)    Mandate that Allegheny immediately allow John to reenroll in the College to complete his education with the same financial aid package that John had before his expulsion.

(d)    Award John compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses and costs; and

(e)    Award John any other and further relief that the Court deems just and proper.

**COUNT III**
**(Promissory Estoppel)**

172.    John Doe incorporates each of the above paragraphs as if fully set forth herein.

173.   John believes that Allegheny's Student Handbook is a binding contract and that Allegheny has materially breached multiple provisions therein relating to the sexual misconduct proceedings in this case.

174.   However, in the event the Court were to find that no such contracts exist, Allegheny, through but not limited to its regulations, standards, procedures and policies, made representations to John, independent of any express contractual promises, that Allegheny expected or should have expected would induce John to apply to and continue to enroll at the College.

175.   Allegheny expected or should have expected John to accept its offer of admission and incur the tuition, fees and costs, necessary for enrollment based on the College's regulations, standards, procedures and polices.

176.   John relied on Allegheny's expressed and implied promises that he would not be discriminated against by the College and would be afforded the aforementioned rights set forth in the Student Handbook.

177.   John justifiably relied on Allegheny's express and implied promises to his detriment, as Allegheny failed to adhere to its regulations, standards, procedures and policies and did, in fact, discriminate against him by failing to provide him with the rights to set forth in the Student Handbook.

178.   As a direct, proximate and readily foreseeable consequence of the above-identified conduct, John has sustained a significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses.

179.    The black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he maintains a record that notes findings of guilt for conduct he did not commit. John has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe, respectfully requests that this Honorable Court enter judgment in his favor against Allegheny and provide the following relief:

(a)    Mandate that Allegheny correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Allegheny and/or Jane;

(b)    Mandate that Allegheny verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record;

(c)    Mandate that Allegheny immediately allow John to reenroll in the College to complete his education with the same financial aid package that John had before his expulsion.

(d)    Award John compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00) as well as prejudgment interest, attorneys' fees, expenses, costs; and

(e)    Award John any other and further relief that the Court deems just and proper.

## COUNT IV
### (Negligence)

180.    John Doe incorporates each of the above paragraphs as if fully set forth herein.

181.    John believes that Allegheny's Student Handbook is a binding contract and that Allegheny has materially breached multiple provisions therein relating to the sexual misconduct proceedings in this case.

182.    However, in the event the Court were to find that no such contracts exist, Allegheny owed duties of care to John independent of any contractual duties including, but not limited to:

  a)    To ensure that its policies and procedures concerning sexual misconduct are fair and reasonable;

  b)    To ensure that its policies and procedures concerning sexual misconduct are compliant with applicable federal/state law, namely, but not limited to, Title IX;

  c)    To adequately train its administration, staff, employees and representatives of such policies and procedures concerning sexual misconduct; and

  d)    To ensure that its administration, staff, employees and representatives adhere to such policies and procedures.

183.    Based on the aforementioned facts and circumstances, Allegheny has breached its duties of care owed to John.

184.    As a direct, proximate and readily foreseeable consequence of Allegheny's aforementioned conduct, John has sustained significant damages including, but not limited to, possessing an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses.

185.    The black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he maintains a

record that notes findings of guilt for conduct he did not commit. John has also suffered monetary damages, emotional distress, loss of education opportunities, and other direct and consequential damages.

WHEREFORE, Plaintiff John Doe, respectfully requests that this Honorable Court enter judgment in his favor against Allegheny and provide the following relief:

(a)      Mandate that Allegheny correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Allegheny and/or Jane;

(b)      Mandate that Allegheny verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record;

(c)      Mandate that Allegheny immediately allow John to reenroll in the College to complete his education with the same financial aid package that John had before his expulsion;

(d)      Award John damages in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses and costs; and

(e)      Award John any other and further relief that the Court deems just and proper.

## COUNT V
### (Unfair Trade Practice and Consumer Protection Law, 73 Pa. C. S. § 201-1, et seq.)

186.    John incorporates each of the above paragraphs as if fully set forth herein.

187.    At all relevant times, the College offered for sale to the public educational goods and services.

188.    At all relevant times, John was a purchaser of educational goods or services for personal, family or household purposes.

189.    In connection with the sale of its educational goods and services and collection of tuition, fees and costs related thereto, the College committed various unfair and deceptive acts and deceptive acts and practices in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. C. S. § 201-1, et seq. ("UTPCPL"), including, but not limited to the following acts, omissions, warranties, and misrepresentations:

a.   Misrepresenting to John in its written policies and procedures that the College would provide a process where "all disciplinary decisions related to the Student Conduct System are based on a review of relevant information and facts," the right to be treated "with respect and impartiality," and that the process would provide that "procedures are to be fair, both in substance and in perception to all persons concerned," when in fact the College would not and did not do so;

b.   Representing to John in its written policies and procedures that the College "shall provide the respondent with a copy of the written complaint," when in fact the College would not and did not do so;

c.   Representing to John in its written policies and procedures that the College promises students that its Title IX Coordinator and Deputy Coordinators are responsible for overseeing reports and complaints brought forward under Policy # 4 "to assure that these matters are handled appropriately and effectively," when in fact the College would not and did not do so;

d.   Representing to John in its written policies and procedures that the "the respondent will be given an opportunity to be heard, to provide documentation and other evidence, and to suggest the names of other persons who they believe might have relevant information," and "will be provided equal access to relevant information and documents," when in fact the College would not and did not do so;

e.   Representing to John in its written policies and procedures that the College would follow the rules associated with its Student Conduct System and Policy # 4, when in fact the College would not and did not do so;

-55-

    f.   Representing to John in its written policies and procedures that College leadership would provide appropriate oversight over investigators and the student disciplinary process overall, when in fact the College would not and did not do so;

    g.   Not informing John in its written policies and procedures that the College would conceal, misrepresent, or exaggerate evidence relevant to its Student Conduct System and Policy # 4, when in fact the College would and did do so;

    h.   Representing to John that he would not be discriminated against, treated unequally compared to female students, or mistreated as a result of his male gender, when in fact the College would and did do so;

    i.   Representing, warranting and guaranteeing in writing that College trained its employees and agents in the proper and unbiased investigation and adjudication of complaints of sexual misconduct, when in fact it had not;

    j.   Representing that John would receive a fair and impartial hearing in connection with any allegation of sexual misconduct, including the right to appeal an adverse hearing decision to the president, when he would not and did not;

    k.   Representing that John would receive adequate notice of and due process in connection with allegation of sexual misconduct, when he would not and did not;

    l.   Misrepresenting Allegheny's compliance with Title IX.

190.    John relied upon the various acts, omissions, warranties and misrepresentations of the College in entering into a contractual agreement with the College upon his matriculation and continuing to make tuition and other payments to the College while a student.

191.    The College's unfair and deceptive conduct constituted false representations of the characteristics and benefits of the College's educational goods and services; constituted false representations that the College's educational goods and services were of a particular standard or quality; constituted a failure to comply with the terms of a written guarantee or warranty;

-56-

advertised educational good and services with the intent not to sell them as advertised; and constituted fraudulent and deceptive conduct which created a likelihood of confusion and misunderstanding - all within the meaning of § 201-2 (4)(v), (vii), (xiv), and (xxi) and § 3 of the UTPCPL, and each of which was the proximate cause of damages and physical, emotional, and financial harm to John.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor against the College for the following relief:

(a)     Find, determine and declare that the College's business practices violate the UTPCPL;

(b)     Award actual and statutory damages, including restitution, treble damages, attorney fees and costs;

(c)     Grant any other appropriate relief.

Respectfully submitted,


By:/s/ Paul J.Susko
    Paul J. Susko
    PA Supreme Ct. ID No. 25995
    502 Parade Street
    Erie, PA 16507
    (814) 461-8585
    paul@ksslawfirm.com


By:/s/J. Timothy George
    J. Timothy George
    PA Supreme Ct. ID No. 67107
    2525 West 26th Street, Suite 200
    Erie, PA 16506
    (814) 833-7100
    tim@purchasegeorge.com

    Attorneys for Plaintiff